JAMES A. BRIGGS et al., Appellants, v. EDWARD ROWE, Respondent.

REAL ESTATE BROKER. NONSUIT.

To entitle a real estate broker to recover commissions upon a sale, it must appear that his efforts were the procuring cause of the sale.

When two brokers have been employed by an owner, and one of them in fact names the property to the purchaser, and the purchaser negotiates solely with him and at his instance with the owner, the other broker is not entitled to commissions, notwithstanding he casually learns that such purchaser is considering the expediency of making the purchase, and therefore calls upon him, and urges the purchase, and reports his name to the owner.

For state of proofs in regard to claim for brokers' commissions, to justify nonsuit, see whole case.

A. Spaulding, for the appellants.*

THIS action was brought in the City Court of Brooklyn, to recover a commission of one per cent upon $14,000, for the sale of a house and lot belonging to the defendant, by the plaintiffs.

The complaint sets up employment of the plaintiffs by the defendant; that they procured a sale to be made for $14,000, which defendant ratified; that their services were worth $140, etc.

The answer is a general denial.

The plaintiffs have once had a verdict.

The action was again tried July 8, 1862. The court ordered judgment of nonsuit, on the ground that the plaintiffs had not proved a case sufficient to go to the jury.

The plaintiffs insisted on their right to go to the jury.

Motion for a new trial was made and denied.

From this judgment and order the plaintiffs appealed to the General Term, in the second district, where the judgment was affirmed. From which judgment plaintiffs appealed to this court.

---

* This argument is condensed from the original printed points, by the omission of much of the evidence there introduced, as the facts relied upon in the case will be found stated in the opinion of the court. — REPORTER.

I. The plaintiffs have shown a case which entitled them, not only to go to the jury, but to a verdict in their favor.

To entitle them to recover, the plaintiffs must show—

1. Employment as brokers, or subsequent adoption or ratification of their acts, by defendant.

2. A sale.

3. That their acts were the procuring cause of the sale. (*Cole* v. *Chilton*, 1 E. D. Smith, 150.)

As to the first and second of these points there is no possible question.

There was employment, and a sale. The question, therefore, upon which the plaintiffs' right to recover will depend, is:

Were the plaintiffs' acts the procuring cause of this sale?

And under this it is proper to consider—

(*a*) What is it necessary for a broker to do to entitle him to a commission?

(*b*) Did the plaintiffs do it?

II. In the case of *Glentworth* v. *Luther* (S. C. 1855, 21 Barb. 145), it is held—

"A broker employed to sell real property, in the nature of things, can do nothing more than find a party who will be acceptable to the owner, unless the owner makes him more than a mere broker, by giving him a power of attorney to convey the property, and then the agent would cease to be a broker, and would become the attorney." "A broker employed merely as such, to sell real property, becomes entitled to his commission, whenever he produces to his principal a party with whom the owner is satisfied, and who contracts for the purchase of the property at a price acceptable to the owner. When this is done, he exhausts his power to act," etc.

In *Morgan* v. *Mason* (4 E. D. Smith, 636), the court say: "When the broker brought the parties together, though there was a delay of some months, and a purchase was finally negotiated between the parties, the broker was entitled to a commission." And see *Doty* v. *Miller* (43 Barb. 529), *Moses* v. *Bierling* (31 N. Y. 462).

From these cases, it is clear, that, in sales of real estate, where manual delivery by the agents is impracticable, the

agency is confined to such action on the part of the broker
as will make the mutual wants of seller and purchaser known
to each other, or bring the parties together, if strangers.

If already acquainted, it is manifestly equivalent, to name
each to the other.

If this be done, and the parties subsequently come together,
the broker has exhausted his power, has performed his duty.
He has "produced the purchaser to the principal." If a sale
result, that is sufficient evidence that the principal is "satis-
fied with the purchaser."

In this case, the seller (defendant) and the purchaser,
Ravenhill, were well known to each other, and in the habit
of having frequent business intercourse.

It was evidently unnecessary for the broker to make a
formal introduction, or even to accompany the purchaser to
the seller.

III. Did the plaintiffs find a party who was acceptable to
the defendant, and produce him to the defendant, who con-
tracted for the purchase of the property at a price acceptable
to the (defendant) owner ?

Is there evidence tending to show these facts ?

We contend, that the affirmative is abundantly proved by
the evidence on the part of the plaintiffs, and that it is not
only not disproved or contradicted by the defendant's case,
but is materially corroborated by the evidence on the part
of the defendant.

It appears clearly from the evidence, that the plaintiffs
made A. Rapelye their agent, and acted at first through him
as such, and through him came in contact with the pur-
chaser.

It is thus shown by the concurring testimony of three
witnesses,

1. That the attention of the Ravenhill family — first the
son, acting for his mother, and through him the mother — was
drawn to this property by the plaintiffs, acting through Ra-
pelye, their agent. (*Qui facit per alium, facit per se.*)

2. That immediate action on the part of the Ravenhills
resulted.

Mrs. Ravenhill (defendant's witness) confirms this, and shows conclusively that she was moved by the agency of the plaintiffs.

She says: "On former trial, I swore my son sent me a memorandum of the house in Pierrepont street, and a house in Montague street. By reason of the memorandum, I went myself and examined the house." *

This, then, was the first movement, the introduction of the business, and, it will appear, led directly to the sale.

This paper memorandum given by Briggs to Rapelye, and by Rapelye to Ravenhill on the boat, containing the street and number of the house, and sent by Ravenhill on the same day (30th March) to his mother, was the prime moving cause of all the subsequent transactions, and was the procuring cause of the sale. Of this, there can be no manner of doubt.

We next find that Briggs, on leaving Rapelye, having learned that Ravenhill wanted such a house, went the same day to Rowe (defendant), and got full particulars of price and terms, and named the purchaser to Rowe; that Rowe knew him, and was in the habit of selling him goods; that Rapelye introduced Briggs to Ravenhill, as the broker who had the house for sale; that Briggs informed Ravenhill who the owner was, and communicated the price and terms, both verbally and in writing through Rapelye.

Thus we have shown the second step in the business. The purchaser was named to the seller as wanting to buy a house,

---

* It will be observed that the opinion of Woodruff, J., does not in terms connect this memorandum with any agency of the plaintiffs, but leaves the inference that it emanated directly from Rapelye. Whether this omission was because the fact, if it was a fact, of the memorandum being that of plaintiffs, was regarded as immaterial, or whether it was not proved to be plaintiffs' memorandum to the satisfaction of the court, does not appear. Other portions of the opinion would lead to the latter conclusion, were it not that no question of the weight of evidence was before the court, only whether there was *any* evidence to go to the jury. The precise bearing of the opinion is less clear to the apprehension, perhaps, than it might have been, had this fact, relied upon by the plaintiffs as vital, attracted the special notice of the court.      Reporter.

and the seller was named to the purchaser as wanting to sell this house; and its condition described, and price and terms communicated.

Rowe and Ravenhill became, through the agency of the plaintiffs, acquainted with each other's wants—one to sell, the other to buy.

They were well known to each other, and needed no introduction by any broker.

The brokers had done their duty thus far, and were ready to do more, if more became necessary.

We claim that we had the right to have this question submitted to the jury, viz, whether or not these acts of the plaintiffs, and this information to seller and purchaser, were or not the procuring cause of their subsequent movements, and of the sale which resulted.

Upon this point, the authorities are clear and decisive. A recent case is in point. "When a question stands doubtful upon an uncontroverted state of facts, or when, as sometimes happens, the facts will admit of either of two conclusions, the proper course is to leave the solution of the question to the jury, and their determination is final." (DALY, J., in *Place* v. *McIvane*, General Term, N. Y. Com. Pleas; transcript January 17, 1863.)

It was now the purchaser's turn to act. And accordingly, we find, as the third step in the business, that Mr. Ravenhill and his mother, following up the information derived from the plaintiffs, took steps immediately to inform themselves fully as to the condition and value of the property.

It appears, too plainly to need argument, that the purchasers were acting as above indicated, and doing so directly upon the motion of the plaintiffs.

The memorandum first, and next the advice of Rapelye, senior, called in, as Mrs. R. (defendant's witness) says, "*in consequence of that*." And further, an offer made, "*based on the opinion of Rapelye, senior*."

A carpenter was also called to advise as to expense of repairs, Briggs having stated that Rowe thought it would cost $1,200.

All this, done in the intervals of business, necessarily took a considerable time.

We shall next find that, having satisfied himself as to the condition and value of the property, and made a very moderate offer, as a feeler, Mr. Ravenhill, within a very few days, took occasion to call on Rowe (defendant), ostensibly to purchase goods only, but really, to give Mr. Rowe an opportunity to mention the subject of the house, by which he (Ravenhill) might derive some advantage in price or terms — a very common caution in business men approaching a bargain; that Rowe did mention the subject, urged him to purchase, and that an immediate sale resulted, at a reduced price.

Lastly, Rowe admitted his liability to plaintiffs.

He was threatened by another broker with a suit. He knew plaintiffs had earned the commission, and he came and offered to pay them, in preference to the other.

Here, then, is the consummation, derived in a perfect chain from the original cause, the memorandum of the 3d of March.

There was no delay; the whole matter was embraced between the 3d and the 12th of March. Within two weeks after Briggs' first meeting with Ravenhill, Rowe told Briggs the house was sold.

The purchaser went to the seller (defendant) as soon as he could reasonably be expected to do so. He prosecuted his inquiries about the property diligently, and called on the owner as soon as he could be ready to talk with him.

When they met, it is evident from the conversation, that there was nothing to be discussed but the price and terms. Ravenhill had evidently determined to buy the property, and the object of calling on Rowe was to get at the lowest price, and to get the most favorable terms.

Rowe's manner of addressing Ravenhill indicates that the matter was recent, and not a remote and abandoned negotiation.

Employment, and acts of plaintiffs tending to procurement of the sale being shown, an abandonment by the purchaser is not to be presumed, but must be shown.

It is nowhere shown, nor is there any thing in the case upon which such a presumption can be raised, but, manifestly, the contrary.

Briggs informed Ravenhill that Rowe was the purchaser, at his first interview, and Ravenhill called on him. The presumption is easy and natural that he called in pursuance of the request of Briggs, and in consequence of the conversation with Briggs.

It is distinctly proved that he intended to go there to give Rowe an opportunity to open the subject.

Employment and acts of agency of plaintiffs being shown, and a sale, the presumption is fair that the plaintiffs' acts were the procuring cause; that is a question solely for the jury.

"The party nonsuited, or against whom a verdict is ordered, is, on appeal, entitled to have every doubtful fact found in his favor." (*Colgrove* v. *N. H. R. R. Co.*, 20 N. Y. 494.)

The purchaser found and produced to the seller by the plaintiffs, was satisfactory to the owner (defendant); the brokers had exhausted their power to act. The owner had sold his house, and had thus accepted and ratified their acts by closing the trade they had initiated with the very party they had found and named to him.

There was no rescinding of the plaintiffs' agency, and while that continued they were entitled to commission upon any sale by whomever made. (*Cole* v. *Chilton*, 1 E. D. Smith, 150.)

The principal undertook voluntarily to complete the work he had employed the plaintiffs, as his agents, to do, and which they were in progress of doing.

There cannot, we submit, be a shadow of doubt that this is not only a *prima facie* case sufficient to be submitted to a jury, being, as it is, the purest question of fact imaginable, but that it is abundantly sufficient to sustain a verdict for the plaintiffs, any thing appearing in the defendant's evidence to the contrary notwithstanding.

The court below conceded that it was a sufficient case, *prima facie*, by denying the motion for nonsuit, at the close of plaintiffs' case, and there is nothing in the defendant's

case that shows even an attempt to contradict it in any particular, but much that confirms it.

Now what is the defense ?

*First.* That Rowe, the. defendant, sold the house and lot himself.

1. But he sold it to the party that the plaintiffs found and produced to him.

He sold it to her by lowering his price from $16,000 to $14,000.

He put 'it through his brokers, at a price which prevented an immediate purchase, and then secured a sale, by doing what he had not given his brokers the power to do; by lowering his price to the views of the purchaser.

This he cannot do, and avoid liability for the commission. It has been tried before and received the rebuke of the courts.

In the case of *Cole* v. *Chilton* (1 E. D. Smith, 150), the court says :

" Where a broker, duly authorized to sell property at private sale, has commenced a negotiation with a purchaser, the owner cannot, while such negotiation is pending, take it into his own hands and complete it, either at or below the price limited, and refuse to pay commission. If vendors were permitted to employ brokers to look up purchasers and call the attention of buyers to the property which they desire to · sell, limiting them as to terms of sale, and then, while such purchasers were negotiating, take the matter into their own hands, avail themselves of the labor, services, and expenses of the broker in bringing the property into market, and accomplish a sale by an abatement of the price, and yet refuse to pay the broker any thing, the business of a broker would not be worth pursuing; gross injustice would be done; every unfair and illiberal vendor would limit his property at a price slightly above the market, and make use of the broker to bring it into notice, and make his own terms with the buyers, who were, in reality procured by the efforts of the agent."

To sustain his theory that he sold the house himself, the defendant attempts to make it appear that the negotiation

which he admits was commenced by the plaintiffs "had fallen through."

This is his conclusion and assertion merely, but is not sustained by any proof.

He misstates the dates of Briggs' visits, and makes the whole transaction run from January, '58, to 14th March. But on cross-examination, he concludes, "it might possibly be first of February; I have no memorandum. It was after the holidays."

It evidently was a matter of very feeble memory, if not of "conjecture."

His admission, then, that plaintiffs were employed and commenced the negotiation, stands in full force against him, and seems quite sufficient to decide the case.

It is evident he would not have sold the house to Ravenhill but for the plaintiffs; he would not have asked R. why he did not buy the house, had he not been previously named to him as wishing to buy it. And this he admits was first done by plaintiffs. Briggs could not have named Ravenhill to Rowe in January or in February, because he never saw or heard of him till the 3d of March, as we have seen. Here are three witnesses to one; which would a jury believe?

Neither Mr. nor Mrs. R. would have been in a position to negotiate with Rowe, had they not previously, as we have shown, been induced to inform themselves of the condition and value of the property. They were then fully prepared to meet the seller, and the trade was accomplished without delay. They went to him when they got ready.

2. Rowe admits that he is liable to some one for a commission.

Rapelye says: "Rowe spoke about Briggs, and Richardson giving him a bond of indemnity, and about a commission for the sale of the house to Ravenhill, said he had been sued by Hondlow, and didn't wish to pay commission to more than one. He said it was due to one of them. He said he thought B. and R. were entitled to it, and offered to pay them if they would indemnify him."

Briggs testifies to the same facts.

Rowe himself says: "I then went around to Briggs and offered to pay him if he would indemnify me."

3. "He did actually pay Hondlow. He testified, Hondlow gave me a bond, and I paid him the money."

4. But we have seen that he employed the plaintiff to sell.

Therefore this defense, viz., that Rowe himself sold the house, goes down.

*Second.* The second defense is that Rowe is liable to Hondlow. That Hondlow was the procuring cause.

1. The answer is, first, this is a special defense, not set up in the answer, and therefore cannot be availed of.

The plaintiffs objected on the trial to evidence as to Hondlow.

This, of itself, is sufficient to entitle the plaintiffs to a new trial.

"Every matter of defense of which a party intends to avail himself on the trial must be set up in his pleadings." (*New York Central R. R. Co.* v. *N. P. Ins. Co.,* 20 Barb. 468; *Brazil* v. *Isham,* 2 Kern. 9; *Catlin* v. *Smith,* 1 Duer, 266.)

"No proof can be offered of facts not put in issue by the pleadings." (*Field* v. *Mayor of New York,* 2 Seld. 179.)

"The law will not assume, in favor of a defendant, any thing he has not averred." (*Cruger* v. *Hudson R. R. Co.,* 2 Kern. 201.)

"The facts must be stated; not conclusions." (*McMurray* v. *Gifford,* 5 How. 14.)

The sole issue here is, whether the plaintiffs (not some other party) were the procuring cause of the sale.

2. It is inconsistent with the first defense.

If this defense is true, then the first, viz., a sale by himself, is a fallacy.

3. His liability to Hondlow would not preclude liability also to the plaintiffs.

He employed the plaintiffs after H., and in view of the fact that H. had charge of the house. He referred Briggs there for the keys.

4. He denied his liability to Hondlow, and refused to pay him.

5. He was not liable to Hondlow.

Hondlow had been employed, about a year previous, but accomplished nothing.

He had, some two months previous to the plaintiffs' action, offered the house, to rent, to Mrs. Ravenhill, but nothing resulted.

Here was a negotiation for renting, in January, and nothing came of it. She " declined to take it." She informed her son of this, when he sent her the plaintiffs' memorandum, March 3d.

We cannot find proof of any thing further done by Hondlow, until after the 3d of March, when the plaintiffs commenced. Any thing done by him after that with the Ravenhills would be simply an interference with the plaintiffs' business and would give him no claim.

The first thing he pretends to have done after his second interview (in January) was to give Mrs. R. the keys, when she said she was going with her friend Mr. Rapelye, Senior, to see what it would cost to put the house in repair."

Hondlow calls this " a few days after" (January 7th). But we have seen that Mrs. R. received the memorandum March 3d, and that, after she received it, and by reason of it, she called on Rapelye, Senior, to examine the house and advise her.

The interval was about two months instead of " a few days," during which nothing was done by Hondlow or any one else.

No sale would have been effected had not the plaintiffs set on foot a new negotiation.

He (Hondlow) did nothing further but to receive and decline a fishing offering ($12,500), which grew out of the plaintiffs' operations, and which was made to him simply because he had charge of the keys, and Mrs. R. had seen him in January.

If that offer had been accepted, and the house sold upon it, the plaintiffs would have been clearly entitled to recover commissions upon it.

Rowe's conclusion was correct. Hondlow had sold no house for him.

Upon his own admissions, then, he is clearly liable to the plaintiffs.

He cannot succeed here on the ground that Hondlow sold or procured the sale of the house.

Thus, we submit, the theories of the defense are very clearly demonstrated to be fallacious, and leave nothing in the case to weaken, in any respect, the case of the plaintiffs, and they were entitled to have it submitted to the jury.

There was evidence tending to show that the plaintiffs were the procuring cause of the sale.

"It is the peculiar province of the jury to reconcile conflicting evidence as to matters of fact, and to decide upon the relative credibility of witnesses, who appear and testify before them." (Bronson, J., *Eaton* v. *Benton*, 2 Hill, 578; *Douglas* v. *Tousey*, 2 Wend. 356; *Denker* v. *Mott*, 8 Barb. 423; *Baker* v. *Martin*, 3 id. 634; *Watkins* v. *Stevens*, 4 id. 168.)

"There was much evidence before the referee, and, whatever our opinion of the correctness of his conclusions, we are all of opinion that a new trial cannot be granted on that ground." (*Spencer* v. *U. R. R. Co.*, 5 Barb. 338.)

"The party nonsuited, or against whom a verdict is ordered, is, on appeal, entitled to have every doubtful fact found in his favor." (*Colegrove* v. *N. H. R. R. Co.*, 19 N. Y. 494.)

There was evidence on both sides as to the question of procuring cause, which was purely a question of fact, and therefore it should have been submitted to the jury.

"It is a familiar and safe principle, and thoroughly settled, that facts are to be tried by the jury." (*Eaton* v. *Benton*, 2 Hill, 578; *Douglas* v. *Tousey*, 2 Wend. 556; *Ernst* v. *Hudson River R. R. Co.*, 24 How. 97.)

The strength and binding force of this rule, as the result of the settled convictions of the courts and of sound reason, is well illustrated in a recent opinion delivered by Judge Hilton, in the New York Common Pleas, in the case of *Reynolds* v. *John Kelly, Sheriff* (reported in the New York Transcript, January 14, 1863).

"The plaintiff claimed to be the owner of a certain stock

of liquors taken by the defendant under an attachment issued against the property of one Jesse Johnson. Judgment for plaintiff. The judge concludes his opinion thus:

" I regret the necessity which, in this instance, leads me to the conclusion that the judgment must be affirmed, because, if the case, as printed, correctly presents the whole of the testimony given at the trial, the proof of the plaintiff's ownership of the property, and its value, was so suspicious and doubtful that a judgment in the defendant's favor would not have been disturbed.

" But the rule that questions arising upon conflicting evidence must be left to the tribunal that hears the testimony and sees the witness upon the stand is inflexible, and we cannot invade it merely because we think the case would seem to have warranted a different conclusion from the one arrived at." Judgment affirmed. DAILY, F. J., concurred.

Finally, the allegations of the complaint were affirmatively proved, and the proof stands uncontradicted.

No valid defense is shown to the plaintiffs' claim.

The court below therefore erred in taking this case from the jury, and the exception of the plaintiffs to said ruling was well taken.

Because they had produced evidence tending to prove the issues on their part.

Because there was evidence on both sides as to the leading fact to be proved, all the other material facts being confessedly established.

Because the allegations of the complaint were proven.

A new trial should be granted.

*Thomas M. North,* also for the appellants.

I. The testimony, if believed by the jury, would have authorized them to find:

That defendant employed plaintiffs to sell his house, as brokers, saying if they sold it or found a purchaser he would pay their commissions.

That on the 3d of March, 1858, a friend of the plaintiffs proposed to Ravenhill to buy this house, and subsequently

introduced one of the plaintiffs to Ravenhill, and they conversed as to price, terms, expense of repairs, etc.

That on the same 3d of March, the plaintiffs went to defendant's store, and informed him of the negotiation. That defendant "said he knew Ravenhill very well, was selling goods to Ravenhill." "Send him to me, I may perhaps arrange price satisfactorily to him." That defendant gave plaintiffs the price on a card, and said the terms could be varied, and so plaintiffs sent the card to Ravenhill.

That this was the first time Ravenhill's name had been mentioned to defendant, or any steps taken to bring them into negotiation for the purchase of the house.

That plaintiffs also named the defendant to Ravenhill as the owner of the property.

That Ravenhill, the same day, sent the memorandum received from plaintiffs, to his mother, and wrote to her to call and examine the property, which she did the same day, " by reason of the memorandum."

That Ravenhill, a few days after, went to the store of the defendant (who had directed plaintiffs to invite him to do so) and had a negotiation with defendant personally, which resulted in his buying the house for $14,000.

That this took place within a week or nine days after the first interview between Ravenhill and the plaintiffs, and wholly in consequence of that interview.

That one per cent was the usual commission paid brokers for similar services.

That defendant acknowledged that plaintiffs " certainly had mentioned Ravenhill's name first," and that he thought they were entitled to commissions, and would have paid them had not a third party sued him, and offered to indemnify him against their claim.

II. As to Hondlow's services in the matter, the jury would have been authorized to find: that his interview with Mrs. Ravenhill, in January previous, was on the subject of renting a house; that she did not like this house, and did not then wish to buy any house, and no negotiations resulted. "Nothing came of it." Ravenhill's name was not men-

tioned to defendant by Hondlow; that the offer made by
Ravenhill to Hondlow, in March, was after plaintiffs' friend
had introduced plaintiff, after plaintiffs had communicated the
negotiation to defendant, after plaintiffs' memorandum had
been sent by Ravenhill to his mother, and after she had gone,
by reason of it, and examined the house, and was wholly in
consequence of Ravenhill's negotiation with plaintiffs; that
Hondlow rejected the offer and did not think it worth while
to mention it to defendant; that defendant testified that
Hondlow had not sold the house for him; that defendant
offered to pay him for his trouble in taking care of the house
only, and finally paid him $140 to get rid of a lawsuit, and
to get a bond of indemnity.

III. If the jury had come to these conclusions, they might
and should have found a verdict for the plaintiffs. Such a
verdict would not have been set aside. (*Stillman* v. *Mitchell*,
2 Robt. 523, 537, 538; *Morgan* v. *Mason*, 4 E. D. Smith,
636; *Glentworth* v. *Luther*, 21 Barb. 145; *Moses* v. *Bierling*,
31 N. Y. 462; *Murray* v. *Currie*, 7 C. & P. 584; *Wilkin-
son* v. *Marbury*, 8 id. 1.)

IV. The nonsuit was, therefore, erroneous. (*Sheridan* v.
*Brooklyn & N. R. Co.*, 36 N. Y. 39; *Ernst* v. *Hudson
River R. R. Co.*, 35 N. Y. 42.)

*G. T. Jenks*, for the respondent.

I. The motion for a nonsuit should have been granted.
There was no evidence whatever offered by plaintiffs to show
that the sale alleged in the complaint was effected by them,
or procured to be effected by them.

The house was not sold by the plaintiffs to any person for
$14,000. The utmost that the plaintiffs have done, as shown
by their evidence, was to offer the property for $16,000 to
Ravenhill, and to communicate the name of Ravenhill to
Rowe. This name had already come to the knowledge of
Hondlow, the defendant's agent and broker in charge of the
house.

They did not introduce the parties. Rowe did not inter-

fere with the negotiation of Briggs, if such it may be called. This case does not fall within the rule which holds the owner liable for commissions who takes the negotiation out of the hands of his broker, and chooses to finish it himself.

In this case the negotiation and action of the plaintiff had terminated — it had been fruitless. Rowe had a right to avail himself of the information that Ravenhill desired to purchase a house; because Ravenhill's attention had first been attracted by Hondlow, the agent first employed by him, and Hondlow had communicated to him the name of Ravenhill and his offer.

If Rowe were liable at all, he was bound to pay Hondlow a commission. The fact that Ravenhill desired to purchase a house was in the knowledge of Rowe before plaintiffs communicated it to him, because known to Hondlow, his agent.

II. The judgment should be affirmed with costs.

WOODRUFF, J. The testimony given on the trial tended to prove, that in June, 1857, the defendant employed Sylvester Hondlow, a real estate broker, to sell the house and lot No. 43 Pierrepont street, in the city of Brooklyn, with coach-house attached, and left with him the keys of the house. Hondlow placed thereon a notice or bill, "For Sale — inquire of S. Hondlow & Co."

That in the end of January, or in February, 1858, Mrs. Sarah Ravenhill called upon Hondlow, and inquired if he had any houses to rent, and the subject of buying was mentioned. He directed her to others. She wished a coach-house attached to the premises. She made some inspection, was attracted by the coach-house privilege, and the next day she called on Hondlow for the keys, and examined the house, or had it examined by her family, and in the evening returned the keys, saying that the house was in bad order, and she did not like it.

She had given up the idea of purchasing that house, but afterward, on or about the 3d of March, her son met upon the ferry-boat, Mr. Augustus Rapelye (with whom and with whose father, Jacob Rapelye, Mrs. Ravenhill had been

acquainted for several years). Mr. Rapelye was aware that Mrs. Ravenhill was looking for a house. A conversation was had between them in regard to the premises, and Rapelye told the son that they were cheap, or that his father, Jacob Rapelye, said the premises could be bought low, and gave the son a memorandum of the street and number.

The same day the son wrote to his mother, sending her that memorandum, and advising her to call and see the property, and in the evening on asking her if she had seen the house, she said she had.

By reason of the memorandum thus received from her son, she sent to Hondlow, and procured the keys again, and went herself and examined the house, and called upon Mr. Jacob Rapelye, and procured him to examine the house for her, to estimate the expense necessary to put the house in repair, and he called on Hondlow and told him he had advised Mrs. Ravenhill to offer him $12,500. The idea of purchasing the premises being thus revived in the mind of Mrs. Ravenhill, and her son requesting her to ask Hondlow to call at her house, she sent him a message of that import, and Hondlow accordingly called upon her and her son, at their residence, and the interview resulted in an offer of $12,500 for the premises.

The next day defendant called at Hondlow's office, " and inquired about matters," and the offer was communicated to him, he inquired who it was that had made the offer, and was told it was Ravenhill. He said, send him to me; and accordingly on the following Sunday Hondlow spoke to Ravenhill (the son) about it, and he said he would call at his (the defendant's) store for some goods, and perhaps he (the defendant) will mention it, and that he thought he could make the arrangement better than through Hondlow. Young Ravenhill called upon the defendant, and purchased goods — the defendant brought up the subject of the sale and purchase of the house. Negotiation (without further interference of Hondlow) was continued at the residence of Mrs. Ravenhill, by defendant, in person, and she purchased the premises at $14,000, and in due course received a deed

and took possession.   The purchaser, Mrs. Ravenhill, having never seen or had any communication with the plaintiffs.

Obviously, in this narration, no instrumentality of the plaintiffs in the matter of the sale appears, and the purchaser was not aware that they had any agency in the matter.   As between her and the defendant (the vendor), so far as there was any intermediate action, it was by Hondlow, the broker, who first called her attention to the house on which was his bill advertising it for sale, her son, who was assisting in the pursuit and negotiation, young Rapelye, whose conversation prompted a renewal of the treaty, and Rapelye, senior, who examined the premises for her, and advised an offer of $12,500.

The agency of the plaintiffs, also real estate brokers, upon which their claim proceeds, was as follows :

In the fall of 1857, one of the plaintiffs called upon the defendant (having learned from one Mellen, that he had the house for sale), to ascertain the price, the size of the lot, etc. The defendant told him that the house was for sale, and that if he (the plaintiff) sold it, or found a purchaser, he would pay his commissions.

A proposition for an exchange appears to have been procured by the plaintiff in the fall or winter, but resulted in no agreement.

After the interview between young Ravenhill and Mr. Augustus Rapelye, above mentioned, in which the latter had had the conversation, and handed to the former the memorandum, which he sent to his mother, as above narrated, Mr. Rapelye went to the office of the plaintiffs, and the plaintiff Briggs, having learned from Rapelye, that Ravenhill wanted to buy a house, went to the defendant's store, and defendant stated the price to be $16,000, of which $9,500 might remain on bond and mortgage.   Briggs mentioned to the defendant the name of the party for whom he wanted the particulars, and the defendant stated that he knew Mr. Ravenhill.

The plaintiff then left at Rapelye's office a card containing the price, which he afterward gave to young Ravenhill; and some days afterward the plaintiff Briggs called with

Rapelye on young Ravenhill, and was introduced to him, and conversed with him on the subject of the house and the probable cost to put it in repair; and, at a subsequent meeting with young Ravenhill, on the ferry-boat, a like conversation was had.

Upon these facts, what was the procuring cause of the sale? and to whose agency was it due?

This question the plaintiffs are entitled to have answered, on a motion for a nonsuit, as favorably to their claim as the testimony will warrant.

I think it should be assumed, that, for all the purposes of this case, any intercourse with Mr. Ravenhill, the son, may be taken in favor of the plaintiffs, as if it had been with the mother, the purchaser herself, however ignorant she was of any agency of theirs in the matter; and that her son may be deemed, for that purpose, her agent.

In my judgment the plaintiffs failed entirely to show either that they negotiated a sale, or procured a purchaser.

If the sale in fact made, is not to be referred directly to the agency of Hondlow, because he first directed Mrs. Ravenhill's attention to the premises, then obviously it was the conversation of Mr. Augustus Rapelye with Mrs. Ravenhill, and the memorandum then handed to him, which set on foot the negotiation, not with the plaintiffs, but with Hondlow, which produced from Mrs. Ravenhill an offer to buy, a reference of Mr. Ravenhill to the defendant for the continuance of the negotiation and an ultimate sale by the defendant to the purchaser, Mrs. Ravenhill.

Hondlow first called the attention of Mrs. Ravenhill to the property. He was and was known to her and her son as the agent for the sale. The negotiation had ceased and she had given up the idea of buying it, but the recommendation of Mr. Rapelye, or his father, whom she knew, induced her son to advise its renewal, and upon that, induced by that, she renewed the negotiations for the purchase.

The claim of the plaintiffs seems to be that they can appropriate this act and conversation of Rapelye, and by some kind of adoption make it their own.

But Rapelye was not acting for them.   He was performing an act of friendship toward his acquaintance, Mr. Ravenhill, whom he causually met.   Rapelye was not employed by the plaintiffs, nor by the defendant.   He by his recommendation of the purchase, stimulated Mr. Ravenhill to urge his mother to renew her negotiations with Hondlow, and she did so. Mr. Rapelye's conversation may have incidentally operated to the advantage of Hondlow, but it conferred no rights upon the plaintiffs.

It does not appear to have been intended, and it certainly did not operate, to lead either the purchaser or her son to treat with the plaintiffs for the purchase; and the interviews which the plaintiffs had with Mr. Ravenhill, appear to have elicited no offer.   When at such interview, Mr. Ravenhill was told that Briggs was agent to sell, he informed him that he had referred the matter to his mother.

In short, the sale was due to the original employment of Hondlow, the examination of the property by Mrs. Ravenhill, assisted by Mr. Rapelye, senior, stimulated by her son, who was moved thereto by his conversation with Rapelye, junior, and his memorandum of the street and number, already long since known to Mrs. Ravenhill herself.

It is, I think, clear that every step in the negotiation would have begun, progressed and reached the final consummation if the plaintiffs had not attempted to intervene.   No one thing done therein by the purchaser, can be traced to the plaintiffs.

The circumstance, that, after the conversation with Mr. Rapelye, which immediately and directly produced a renewal of the negotiation with Hondlow, the plaintiff Briggs conceived the idea of taking up the negotiation with Mr. Ravenhill, and, with that view, mentioned his name to the defendant as an expected purchaser, is wholly unimportant. He was not then in negotiation with Ravenhill; on the contrary, the information received by the latter from Mr. Rapelye, was then at work, producing a renewal of the negotiations with Hondlow, which, after he had referred Ravenhill to the defendant, resulted in a sale.

These views are in no conflict with *Chilton* v. *Butler* (1 E.
D. Smith, 150); *Moses* v. *Bierling* (31 N. Y. 462), nor with
the cases there cited. Indeed, if we were to adopt the doc-
trine of one of those cases (*Jacobs* v. *Kolf*, 2 Hill, 133), that
where a specified price is fixed by an owner, and a broker is
promised a commission for selling at that price, and fails, he
is not entitled to his commission, although, through another
broker, the owner sells at a less price, the plaintiffs' claim
could have no possible legal foundation. Without discussing
the question as it arose upon the particular circumstances of
that case, I think it clear that the broker is entitled to be
protected, as stated in *Chilton* v. *Butler*, against any unfair-
ness or fraud, and that the owner, when there is a general
employment to sell, cannot avail himself of the services of
the broker in finding a purchaser, and then, by taking the
negotiation into his own hands, and reducing his price, effect
a sale, and refuse payment of commissions. And, on the
other hand, if the broker sees fit to accept an employment,
the just and fair import of which makes his title to commis-
sions depend upon his securing a purchaser on terms that are
specified, he must perform the undertaking, just as any party
must perform his contract in order to claim his commissions;
even then, however, the employer may not interfere and pre-
vent such performance.

But, without pursuing these legal questions into their vari-
ous possible qualifications, it must suffice to say that the non-
suit was properly ordered upon the grounds above stated;
and the judgment should be affirmed.

MILLER, J. This action was brought by the plaintiffs to
recover a commission of one per cent upon $14,000, for a
sale of a house and lot of the defendant, alleged to have been
made by the plaintiffs as his brokers. At the close of the
testimony upon both sides upon the trial, the court refused
to allow the plaintiffs' counsel to go to the jury upon the
question whether the plaintiffs had made out a cause of action,
and nonsuited the plaintiffs, to which rulings and decisions
exceptions were duly taken.

The first and main question which we are called upon to determine is, whether there was any evidence in the case for the consideration of the jury which tended to establish, that the sale of the house alleged in the complaint was effected or procured by, and which would authorize a verdict in favor of, the plaintiffs. To determine this question it becomes important to examine the testimony in the case, and consider whether it will bear a construction which would authorize the conclusion that the plaintiffs had procured the sale. The evidence of Briggs, one of the plaintiffs, is relied upon mainly to sustain the theory that the plaintiffs made the sale, and, even although it may be contradicted, yet, if it tends to establish that such was the fact, it would clearly have been proper to submit the case to the jury. According to Briggs' version of the transaction, in March, 1858,.a friend of the plaintiffs proposed to one Ravenhill to. buy the house, and Briggs called upon the defendant at his store, and took down the price, which was $16,000, and the terms. He mentioned the name of the party to the defendant, who said he knew him very well; that he was selling goods to him, and the payments could be varied from what he had taken down. Briggs was subsequently introduced to Ravenhill, and conversed about the property and the price it would cost to put it in repair; and it appears, that the card or memorandum which contained the terms was delivered to Ravenhill. He also testifies that he never offered the house at any other price than $16,000 to Ravenhill, which he declined, and never sold it to any one at that price., It also appears from Briggs' evidence as well as the defendant's, that some time previously, and in the latter part of 1857, Briggs called at the defendant's office to ascertain whether the property was for sale, and the terms; and the defendant told him if he, Briggs, found a purchaser, the defendant would pay his commissions. The evidence also shows, that one of the plaintiffs named the defendant to Ravenhill as the owner of the property; that the memorandum of the terms of sale was sent by Ravenhill to his mother, and he wrote to her to call and examine the property, which she did, by reason of the memorandum, on

the same day; that the defendant requested Briggs to send Ravenhill to him, which was not done, nor any offer brought to him from Ravenhill. According to the testimony of Ravenhill, Briggs gave him no further information besides the memorandum, except that the price was $16,000; and he, Ravenhill, told the defendant, upon inquiry afterward, that the reason he had not bought the property was because the price was too high.

These are the leading facts relied upon by the plaintiffs to establish their right to recover. But it also appears that some time in the month of May or June, 1857, the house had been placed in the hands of one Hondlow, a broker, to be sold, the keys left with him, and his bill put upon it; that, in the month of January or February, following, he had an interview with Ravenhill as to the purchase, and shortly afterward, Ravenhill offered him $12,500 for the property; that after the negotiation between Briggs and Ravenhill had failed, Ravenhill went to the store of the defendant, and there a negotiation was opened between them which resulted in a purchase of the property by Ravenhill for $14,000. According to the evidence of Ravenhill, he called upon Rowe about one week after he had failed to agree with Briggs. According to the testimony of Rowe, it was about six weeks after the prior negotiations had fallen through. Whether the first or the latter period, is not material, perhaps, provided no agreement for a sale was made by reason of the acts of the plaintiffs, or by means of their instrumentality.

The most which the plaintiffs seem to have done in negotiating the sale, was to offer the property to Ravenhill for $16,000, and to give the name of Ravenhill to Rowe. Hondlow, who had been employed to sell the house, and had charge of it, was already acquainted with Ravenhill's name, and so far as this fact is concerned, it was no particular advantage to the defendant to be informed of it. The parties did not get together by reason of the plaintiffs' action; were never introduced, and Briggs had full opportunity to negotiate a sale without any interference of the defendant or any other party. He did not succeed in so doing, and utterly failed to

accomplish any such result. It was no fault of the defend-
ant that such was the case. He made no objection, opposed
no obstacles, and in no way interfered with the negotiation.
He did not take the matter out of the broker's hands and
thus render himself liable.

But, after it proved fruitless and unavailing, after it had
terminated and was at an end, it would seem, by means of
the accidental fact that Ravenhill had come to his store to
purchase a bill of goods, he commenced a negotiation for the
sale of the house, which resulted in an agreement which was
finally consummated.

It does not make the defendant liable I think, because he
availed himself of the information which he had obtained,
that Ravenhill desired to purchase the house, for it appears
that Hondlow first informed Ravenhill, that the house was
for sale and had informed the defendant of the offer of Raven-
hill. It cannot, I think, be claimed fairly that the plaintiffs
found the purchaser, or that they were the procuring cause
of the sale, and of bringing the parties together. The nego-
tiation had been entirely ended so far as the plaintiffs had
any connection with it, and there must be some period of
time when a party is at liberty to make new negotiations for
the disposition of property, where it is not entirely clear that
the whole matter originated with another person, without
rendering himself liable for commissions.

It matters not whether Rowe was bound to pay Hondlow
a commission for his services. It is enough in this case, that
he was not liable to the plaintiffs, and that there was no
sufficient evidence of his liability to submit to the considera-
tion of the jury. If the jury, upon the testimony presented,
had arrived at the conclusion that the defendant was liable,
I think the court would have been compelled to set aside the
verdict as contrary to evidence.

The judge was clearly right in granting the motion for a
nonsuit, and refusing to submit the case to the jury, and as
there was no error upon the trial, the judgment must be
affirmed with costs.

Judgment affirmed.